IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WILLIAM H.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-1223-RJD[2] |
| | ) | |
| COMMISSIONER of SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER**

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for child's insurance benefits based on disability and his application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

**Procedural History**

In June 2022, Plaintiff applied for child's insurance benefits and protectively filed an application for supplemental security income, alleging an onset date of September 26, 2021. Tr. 17. After holding an evidentiary hearing on April 1, 2024, ALJ Stuart Janney denied the application on May 20, 2024. Tr. 17, 32, 33. On March 31, 2025, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision final and subject to judicial review. Tr. 1. Plaintiff filed a timely Complaint with this Court.

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Order due to privacy concerns. *See* Advisory Committee Notes to Fed. R. Civ. P. 5.2(c).

[2] Pursuant to 28 U.S.C. §636(c), this case was assigned to the undersigned for final disposition upon consent of the parties. Doc. 12.

**Applicable Legal Standards**

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations. The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404; the statutes and regulations pertaining to SSI are found at 20 C.F.R. pt. 416. A person is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). A disabled child's insurance benefits may be paid where the claimant is 18 years old or older and has a disability that began before the age of 22. 20 C.F.R. § 404.350(a)(5).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) is the claimant doing substantial gainful activity?; (2) does the claimant have a severe medically determinable physical or mental impairment?; (3) does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?; (4) is the claimant able to perform his former occupation?; and (5) is the claimant able to perform any other work? 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4) An affirmative answer at step 1 or step 4 or step 5 precludes a finding of disability. *Id*.

This Court determines whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Tutweiler v. Kijakazi*, 87 F. 4th 853, 857 (7th Cir. 2023) (internal citations and quotations omitted). Substantial evidence is defined as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* In reviewing for "substantial evidence," the entire administrative record is taken into consideration,

but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2023) (internal citations and quotations omitted). However, the undersigned does not act as a rubber stamp for the Commissioner. *See Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). There must be a "logical bridge" between the ALJ's conclusion and the evidence. *Hess v. O'Malley*, 92 F. 4th 671, 676-77 (7th Cir. 2024) (*citing Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020)).

**The Decision of the ALJ**

The ALJ followed the required five-step analytical framework. Tr. 20-31. He determined that as of September 26, 2021, Plaintiff had not attained age 22 and had not engaged in substantial gainful activity since that date (the alleged onset date). Tr. 20. He determined that Plaintiff had the following severe impairments: bipolar disorder, generalized anxiety disorder, obsessive compulsive disorder ("OCD"), and attention deficit-hyperactivity disorder. Tr. 20. However, he found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the applicable regulations. Tr. 21.

The ALJ determined that Plaintiff had the following RFC:

> [He can] perform a full range of work at all exertional levels but with the following nonexertional limitations. He can understand, carry out, make judgments regarding, and remember simple instructions. He can respond appropriately to supervision. He can tolerate frequent interactions with coworkers and the public and can respond appropriately during the interactions. He can deal with occasional changes in a routine work setting. He can work in a setting where supervisors set production goals and set work processes.

Tr. 23. Because Plaintiff did not have past relevant work, transferability of job skills was not an issue. Tr. 31. The ALJ concluded that considering Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." Tr. 31.

## The Evidentiary Record

The following summary of the record is tailored to Plaintiff's arguments.

### 1. Medical records

Plaintiff treated with multiple providers at Wabash General Hospital from April 2022-February 2024 for the diagnoses of ADHD, Bipolar 1 disorder, and generalized anxiety disorder. Tr. 356-491. On at least four occasions, his providers listed autism as one of his conditions/ diagnoses. Tr. 333, 354, 372, 489. Plaintiff saw Psychiatric-Mental Health Nurse Practitioner Leann Lear every 1-3 months and received regular treatment from a therapist during that period. Tr. 330, 377-493. Nurse Practitioner Lear listed Autism Spectrum Disorder as a differential diagnosis. Tr. 330, 331. In April 2022, Plaintiff and his mother asked for a female therapist; Plaintiff reported that he had a difficult time relating to males. Tr. 330. Plaintiff's goal was to "develop skills that will allow him to have better control over his mood and anger outbursts." Tr. 377.

From February 2023-November 2023, Plaintiff's therapist and nurse practitioner noted at each visit that he was comfortable, interactive, and readily engaged in discussion. Tr. 358, 360, 363, 378, 384, 398, 404, 411, 417, 424, 428. Plaintiff reported regularly attending sporting events in Evansville, Indiana; he also reported manic episodes where he experienced racing thoughts that made it difficult for him to sleep, or flashbacks to a time where he was hospitalized in a mental

health unit and staff "forced shots upon him.' Tr. 331, 334, 356, 357, 366. Nurse Practitioner Lear noted that Plaintiff "has been able to control outbursts for several years." Tr. 366, 385. Plaintiff's therapist noted that he recalled a situation where a waiter spilled drinks down his back and he did not get upset; this was an example of an event that would have caused him to become very upset in the past. Tr. 357. However, in September 2023, Plaintiff attended a baseball game and threatened one of the players; after the player used a racial slur, Plaintiff said "if you say something again I will knock your nose down your throat so far you will never be able to find it again." Tr. 390.

Several weeks later, Plaintiff reported "more recent agitation" and his grandmother questioned whether his medication should be increased. Tr. 397. Plaintiff agreed to try "a very small dose" of Seroquel prescribed by Nurse Practitioner Lear to see if it helped his sleep and irritability. Tr. 405. Plaintiff reported that Seroquel helped him sleep and he felt "much less irritable." Tr. 410, 418.

In January-February 2024, Plaintiff underwent an "Initial Evaluation" at Wabash Community Health Center Behavioral Health. Tr. 448. His main concerns were "anger, therapist left position, [and he was] sleeping an average of 3 hours every night." Tr. 448. This evaluation spanned two visits. Tr. 448, 456, 461. Plaintiff reported that when he was six years old, his father threw him over the television. Tr. 466. In fourth grade, Plaintiff's "teacher treated him differently than the rest of the students, the nurse wouldn't give [Plaintiff] his medicine, school denied his request for [accommodations]." Tr. 466. Plaintiff "drew his teacher with a gun to her head and then the following day stabbed his sister at school with some wood." Tr. 466. Plaintiff and his twin sister were then home schooled. Tr. 466. The therapist noted that Plaintiff "meets

the criteria for PTSD however, [therapist] will continue monitoring symptoms and reevaluate later on before diagnosis because [Plaintiff] doesn't seem to have significant distress." Tr. 475.

Nurse Practitioner Lear saw Plaintiff on February 27, 2024. Tr. 491. She noted that his mother mentioned "increased irritability" and she increased Plaintiff's Seroquel prescription. Tr. 491.

**2. Agency Records**

Plaintiff's mother completed a Function Report. Tr. 211-218. She reported that Plaintiff's "attention span [is] horrible" and he "blurts out inappropriate words/sayings." Tr. 211. She further reported that he sleeps very little and is constantly on the move. Tr. 211. He "hears people calling his name" and gets frustrated when presented with written instructions. Tr. 216-2117. He does not drive because of his anxiety. Tr. 214. He does not perform hygiene without assistance. Tr. 211-212.

**3. Medical Opinions**

Plaintiff presented to Jonathan Thomas-Stagg, Ph.D. on December 21, 2020 for a psychological consultative exam. Tr. 25, 298-301. Plaintiff's mother reported that Plaintiff was diagnosed with bipolar disorders in 2008 or 2009 and that he has manic episodes 2-3 times a year in which he will punch, hit, and break things; he also has smaller manic episodes approximately once a month that involve verbal threats and last approximately 5-10 minutes. Tr. 298. Plaintiff's mother reported that he had been homeschooled since the fifth grade when Plaintiff "was vomiting every day at school and 'wanted to kill people' when he was there." Tr. 299. Plaintiff did not have an IEP "because he was fine academically." Tr. 299. Plaintiff's mother reported he was averse to showering and that she or Plaintiff's grandparents would "wipe him

down." Tr. 299. Plaintiff's mother further reported that he was hospitalized in 2015 for "attempted homicide of his mother" and ""the hospital gave him a diagnosis of Autism with symptoms of being interested in video games, not liking his neck touched, not liking to eat onions, and not liking to wear certain materials." Tr. 299. Plaintiff's mother also reported that Plaintiff "stabbed his sister with a pencil at school, but no actions were taken at school because it was his sister." Tr. 299. Plaintiff reported that his "biggest barriers to having a job is 'all of it' and having to 'deal with people.'" Plaintiff was "not currently seeing a therapist due to insurance issues."

Plaintiff's mental status exam was within the range expected for his age and education. Tr. 301. He was "cooperative and responsive" during the 45-minute examination. Tr. 301. Dr. Thomas-Stagg noted DSM-5 diagnoses of bipolar disorder and attention deficit hyperactivity disorder, "by history." Tr. 301. Dr. Thomas-Stagg also noted that Plaintiff's mother spoke to him as if he were a toddler. Tr. 300. Plaintiff "related adequately well" to Dr. Thomas-Stagg and his insight and judgment were "good for [his] age." Tr. 300.

State agency psychological consultant Howard Tin, Psy.D. made the initial determination regarding Plaintiff's residual mental capacity. Dr. Tin found that Plaintiff's ability to concentrate, persist, or maintain pace was moderately limited. Tr. 68. Plaintiff's ability to carry out detailed instructions was moderately limited; his ability to carry out very short and simple instructions was not significantly limited. Tr. 70. Dr. Tin further noted that Plaintiff "has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however [Plaintiff] is capable of performing simple tasks."

During the reconsideration stage, state agency psychological consultant David Voss, Ph.D.,

evaluated Plaintiff's residual mental capacity. Tr. 88. Just like Dr. Tin, Dr. Voss found that Plaintiff's ability to carry out detailed instructions was moderately limited, but his ability to carry out very short and simple instructions was not significantly limited. Tr. 90. Dr. Voss explained that the "evidence in file….indicates that he has the concentration and ability to carry out simple tasks requiring routine judgment, but not detailed tasks." Tr. 90.

Nurse Practitioner Lear completed a Mental Residual Functional Capacity Statement regarding Plaintiff on December 7, 2023. She opined that because of his obesity, severe social impariments, educational limitations, and need to avoid noise, Plaintiff could not obtain and retain work in a competitive work environment for eight-hour work days, five days a week. Tr. 374. She noted that he could not "interact with the public" or "accept instructions and respond appropriately to criticism from supervisors" or "get along with coworkers or peers" for 15% or more of an eight-hour workday. Tr. 372-73. Nurse Practitioner Lear noted that she based these opinions on her records of treatment and her evaluations of Plaintiff.

**4. Evidentiary Hearing**

The ALJ held a hearing on April 1, 2024. Tr. 40. Plaintiff testified that he obtained his high school diploma via homeschooling. Tr. 45-46. He lives with his mom, sister, grandparents, and uncle. Tr. 47. He has never had a job or applied for one. Tr. 47. He feels that he cannot work because of his anger and impulsiveness. Tr. 48. He provided the following explanations:

> …a week ago, I was—my Poppa wanted to show me something in the backyard. I saw a mouse. I tried to pick it up and throw it out. It bit me. I kind of blacked out. I—I don't know, from what I've been told, it hit—I hit it off of a bunch of stuff and squished it.
>
> …a few days ago, some dude ran up on to our porch and my mom posted a picture of him…and he came back to confront her. His girlfriend, or whatever she was, in the car called my mom a b****.

> I quickly grabbed a metal pole and I was about to go out there until [my grandpa] grabbed me.

Tr. 48, 49. Plaintiff explained that he had "really bad" outbursts every few weeks, but typically has small outbursts every day over "ordinary everyday things." Tr. 48. He blacks out "probably a few times every few months." Tr. 55.

Plaintiff testified that he had racing thoughts when he is trying to sleep, and sometimes while he is awake. Tr. 50. His medication "helps sometimes." Tr. 51. He spends his days "playing some video games" but has to "keep switching back and forth from different games" to keep focused. Tr. 53.

The ALJ posed the following hypothetical to the vocational expert:

> …assume a hypothetical individual in the younger age category, who has a high school education. The individual has no past work experience…….the individual could understand, carry out, make judgments regarding, and remember simple instructions…the individual can respond appropriately to supervision, could tolerate frequent interaction with co-workers and the public, and can respond appropriately during the interactions….can deal with occasional changes in a routine work setting, and must work in a setting where supervisors set production goals and work processes as opposed to a situation where the individual can come in and determine his own work priorities.

Tr. 57-58. The vocational expert testified that the individual could work as a dishwasher and there are 107,000 dishwasher jobs that exist in the national economy. Tr. 58. The individual could work as a laundry sorter and there are 39,000 laundry sorter jobs in the national economy. Tr. 58. The individual could work as a conveyor feeder; 31,000 jobs exist in the national economy. Tr. 58. If, however, that same individual had one incident per week involving a verbal or physical outburst, competitive work would not be possible. Tr. 59.

**Analysis**

First, Plaintiff argues that the ALJ failed to consider the opinions by Drs. Tin and Voss that Plaintiff was "moderately limited in his ability to carry out detailed instructions." To the contrary, the ALJ discussed the opinions by Drs. Tin and Voss and found that Plaintiff "had moderate limitations in all four areas [of the residual mental capacity]…he could perform simple tasks." The ALJ limited Plaintiff to simple instructions in the RFC. The ALJ then adopted the vocational expert's testimony that Plaintiff could perform the positions of dishwasher, conveyer feeder, and laundry sorter. However, Plaintiff correctly notes that the Dictionary of Occupational Titles ("DOT") lists dishwasher and laundry sorter as requiring "02 Level Reasoning Development."[3] According to the DOT, an individual with Level 2 reasoning development must carry out "detailed but uninvolved" written or oral instructions; in comparison, an individual with Level 1 reasoning development must carry out "simple or two step instructions." [4]

It is the Commissioner's burden to establish that jobs exist in the national economy that Plaintiff could perform. *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008). The ALJ relied upon the vocational expert's testimony in finding that Plaintiff could perform the work of a dishwasher or laundry sorter, and the vocational expert relied upon the DOT. Tr. 60. The DOT states that individuals who work as laundry sorters and dishwashers must be able to follow detailed instructions, but the ALJ limited Plaintiff to following simple instructions. Consequently, the ALJ's decision at Step 5 is not supported by substantial evidence. *See Overman*, 546 F.3d at 464. The Commissioner makes no effort to address or even mention this argument.

---

[3] https://occupationalinfo.org/31/318687010.html (last accessed Sept. 15, 2026); https://occupationalinfo.org/36/369687010.html (last accessed Sept. 15, 2026);
[4] https://occupationalinfo.org/appendxc_1.html (last accessed Sept. 15, 2026).

Plaintiff also contends that the ALJ's finding that Plaintiff could "respond appropriately" to supervisors and the public is not supported by substantial evidence. This argument is simply an invitation to reweigh the evidence, which the undersigned will not do. Plaintiff points to his testimony regarding "anger outbursts and blackouts." However, as the ALJ discussed, NP Lear's notes reflect that Plaintiff had been able to control his outbursts for "years." Tr. 28, 366, 385. The ALJ also included the note by Plaintiff's therapist regarding Plaintiff's improved ability to control outbursts. Tr. 27, 357. Accordingly, there is a logical bridge between Plaintiff's medical records and the ALJ's finding that Plaintiff could respond appropriately to supervisors and interact with the public.

Finally, Plaintiff argues that the ALJ "played doctor" in finding that Plaintiff's autism was non-medically determinable. An ALJ impermissibly adopts the role of a doctor by "interpreting medical evidence when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). On a handful of occasions, Plaintiff's treaters at Wabash General Hospital included autism in their list of Plaintiff's diagnoses. The ALJ explained why those records were "entirely subjective or only historical" and noted the absence of a definitive diagnosis or regular treatment for autism. Tr. 20-21. Plaintiff carried the burden of producing medical records for the ALJ to review that supported his claim of disability. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). No improper interpretation of medical evidence occurred.

## Conclusion

The ALJ failed to support his decision at Step 5 with substantial evidence. After careful review of the record as a whole, the Commissioner's final decision denying Plaintiff's application for child's disability benefits and supplemental security income is therefore REVERSED AND

REMANDED to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: September 16, 2026**

**Hon. Reona J. Daly**
**United States Magistrate Judge**